CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

KELLY I. VOLKAR (CABN 301377)
Assistant United States Attorney

1301 Clay Street, Suite 340S
Oakland, California 94612
Telephone: (510) 637-3680
FAX: (510) 637-3724
Kelly.volkar@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JERRAD BRANDON WILLIAMS,<br><br>Defendant. | CASE NO. 4:26-cr-00118-HSG; 4:18-CR-00547-HSG<br><br>UNITED STATES' SENTENCING AND VIOLATION MEMORANDUM<br><br>Date: August 19, 2026<br>Time: 2:00 p.m.<br>Judge: Hon. Haywood S. Gilliam, Jr. |

**INTRODUCTION**

On November 29, 2025, defendant Jerrad Brandon Williams, a convicted felon with considerable criminal history—including two prior federal convictions for being a felon-in-possession-of-a-firearm—possessed a Glock 9mm handgun and ammunition while on federal supervised release. Specifically, while Oakland Police Department (OPD) officers were on patrol, Williams was in front of a G1 Liquor store in Oakland with a camouflage satchel and large bags of marijuana. When officers approached, Williams went into the Liquor Store and returned without the satchel. The officers noted a vehicle was parked in the red zone, which Williams claimed as his, and the officers asked him to move the vehicle out of the red zone while the officers went inside the store. Williams instead followed OPD officers into the store, struck up a conversation with them when they approached where he had hidden the

camouflage satchel, and then tried to grab the bag and leave the store quickly ahead of the officers. When OPD officers detained and frisked Williams, he said the satchel had his "protection." The handgun, which had a loaded magazine and a round in the chamber, was found in the bag Williams was carrying. Six live rounds of 9mm ammunition were also found in the car parked in the red zone that Williams had claimed belonged to him.

As part of a violent crime reduction initiative in Oakland, Williams was charged with and ultimately pleaded guilty to being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).

For the reasons set forth below, the government requests that the Court sentence Defendant to 42 months of imprisonment, a three-year term of supervised release (with the conditions recommended by probation and set forth in the plea agreement), a $100 special assessment, and order forfeiture of the firearm, ammunition, and other items seized. Specifically, the government requests that the Court sentence Williams to 18 months in this matter (No. 4:26-CR-00118-HSG), to run consecutive to the statutory maximum of 24 months in the Form 12 (No. 4:18-CR-00547-HSG).

## BACKGROUND

### I. The Illegal Possession of Firearms Poses an Unacceptable Danger to Oakland and Surrounding Communities

The relevant conduct in this case is described below but the defendant's conduct in this case did not occur in a vacuum. Rather Williams's illegal possession of a firearm helps to fuel the wave of gun violence that is and has been ravaging Oakland. The proliferation of illegal firearms amplifies the issue of violent crime, as robberies, burglaries, domestic violence incidents, or even routine altercations like road rage incidents, carry the potential to become deadly when the participants are armed. Illegal firearms are also central to the challenge of gang violence, with groups of young armed people too often turning residential neighborhoods into combat zones. Although the rate of shootings has fallen from its peak in 2023, the number of shootings and gun-related murders remains unacceptably high.

Harrowing statistics underscore the damage illegal firearms inflict on Oakland. In 2025, the city suffered 67 homicides, at a rate of 15 homicides per 100k residents. This homicide rate is *five times* the rate of San Francisco, and also substantially higher than neighboring cities in Berkeley and San Leandro.




| City | 2025 Population | Homicides 2025 | Homicides (per 100k) |
|---|---|---|---|
| *Oakland* | *444,196* | *67* | *15* |
| San Francisco | 826,079 | 28 | 3 |
| Los Angeles | 3,874,000 | 230 | 6 |
| Berkeley | 123,195 | 1 | 0.8 |
| San Leandro | 86,587 | 3 | 3.5 |
| San Jose | 993,000 | 24 | 2.4 |

It is not a mystery why Oakland has suffered so many more homicides than its neighbors. It is because of illegal firearms. Of the 67 homicides in 2025, 65 of them were committed with a firearm, and only 2 involved some other means. Indeed, as part of the violent crime reduction initiative, one of the other defendants charged—not Williams—had engaged in a shootout in a crowded downtown Oakland nightclub in the early morning of March 7, 2026, in which two people were killed—including a schoolteacher who was shot as she attempted to run from the gunfire—and at least five others also suffered gunshot wounds during the incident. *See United States v. Jarvis Toussaint*, Case No. 4:26-cr-00235-JSW, Dkt. 1.

And the problem is not limited to murders. There were 350 individuals who were shot in 2025, many suffering gruesome injuries with lifelong impacts. 2025 also saw 1,674 robberies and 2,950 aggravated assaults in 2025. As with homicides, Oakland suffers robbery and aggravated assaults at a much higher rate when compared with its neighbors. And a substantial portion of these violent crimes also involved firearms. Indeed, these violent confrontations, when mixed with illegally possessed firearms, all too often escalate into a shooting or a murder.

Nor has the problem abated in 2026. Through only the first quarter of 2026, Oakland had already suffered 13 homicides, 374 robberies (102 involving firearms), 588 aggravated assaults, and 53 assaults with a firearm (including shootings and injuries by firearms). These statistics are staggering.

This is also not a problem that is limited to people already involved in criminal activity. Every resident of Oakland is made less safe by these illegal guns. Innocent bystanders uninvolved in criminal activity have been maimed and killed. For example, in 2021, an almost two-year old boy was shot and killed in his car seat in his family vehicle when gang members engaged in a shootout on I-880 in Oakland. And, as described above, in March 2026, an innocent 33-year-old middle school teacher was murdered at a mass shooting at a night club in Oakland. Another defendant (not Williams) charged in the violent crime reduction initiative is charged with illegally possessing a gun that was involved in a shooting in a parking lot near two schools in Oakland.[1]

These tragedies and grim statistics are astounding, and they are unacceptable. Oakland has suffered enough. The proliferation of illegal firearms is not a trivial matter, but a direct threat to the safety of the community. Williams's offense, particularly the repetitive nature of him illegally possessing a firearm, is grave and must be set against this context of a culture of violence in Oakland that must be disrupted.

## II. Offense Conduct

On November 29, 2025, Oakland Police Department (OPD) officers were patrolling near 73rd Avenue and Weld Street when they observed a silver vehicle without a front license plate parked in a red zone in front of the G1 Liquor Store. Presentence Investigation Report ("PSR") ¶ 6. An individual, later identified as Williams, was observed walking away from the vehicle and entered the liquor store with a camouflage-colored bag. *Id.* As an uniformed OPD officer approached, Williams exited the liquor store without the bag and stated that he would move the vehicle. *Id.* The officer recognized Williams from prior contacts. *Id.* Officers questioned Williams about the camo-colored bag and entered the liquor store to determine whether Williams had hidden it inside. *Id.* ¶ 7. While the officers were searching inside the store, Williams grabbed the bag and attempted to hastily exit the store. *Id.* Officers

[1] https://www.justice.gov/usao-ndca/pr/arrests-seizures-and-federal-firearms-charges-surge-oakland-through-coordinated.

intercepted Defendant, detained him, and seized the bag. *Id.* Defendant spontaneously volunteered that he had his "protection" in the bag. *Id.*

Inside the bag, officers found a Glock 9mm handgun with a gold slide, a loaded magazine, and a round in the chamber. *Id.* ¶ 8. The firearm did not have a serial number. *Id.* Officers searched the vehicle and found six live rounds of 9mm ammunition, which were determined to have traveled through interstate commerce. *Id.* ¶ 9. Officers also found a large plastic bag containing several individual packages of a green plant-like substance suspected to be marijuana. *Id.* Officers also searched Williams, who spontaneously admitted to selling "weed" and having "dope" on his person. *Id.* Officers found several individually wrapped, hard, white, rock-like substances suspected to be crack cocaine. *Id.* ¶ 8.

Williams was a felon prohibited from possessing a firearm or ammunition, and he was on federal supervised release at the time of the incident. *Id.* ¶ 9, 31.

## III. Criminal History

Defendant has suffered the following convictions as an adult (PSR ¶¶ 26–31):

- 2007: California Penal Code §§ 459, 460(a) — Second-Degree Burglary;
- 2007: California Penal Code §§ 459, 460(a) — First-Degree Burglary;
- 2014: California Health & Safety Code § 11350(a) — Felony Possession of a Controlled Substance;
- 2014: 18 U.S.C. § 922(g)(1) — Felon in Possession of a Firearm and Ammunition;
- 2017: California Penal Code § 273.5(a) — Inflicting Corporal Injury on a Spouse or Cohabitant;
- 2018: 18 U.S.C. § 922(g)(1) — Felon in Possession of a Firearm and Ammunition.

In 2014, when Williams was convicted for felony possession of cocaine, he had been arrested as one of three defendants involved in a recent shooting, and Williams had been identified as the person holding the firearm. PSR ¶ 28. Later that year, ATF agents conducted a probation search on Williams's residence and found in his bedroom a handgun with an obliterated serial number, loaded with 15 rounds, and in the kitchen found a Savage model 64 .22 caliber rifle and a Mossberg model 500 12-gauge shotgun. PSR ¶ 29. The possession of the handgun led to Williams's first federal conviction for

§ 922(g)(1). *Id.* Williams was sentenced to 40 months' imprisonment. *See* No. 4:14-CR-00612-JSW (N.D. Cal.).

Defendant's 2017 and 2018 convictions came while he was on federal supervised release following his 2014 convictions. PSR ¶ 29–31. For the 2017 domestic violence conviction, Williams choked his female partner and then punched her six or seven times. PSR ¶ 30. In 2018, Williams was still on federal supervision and once again possessed a firearm illegally. PSR ¶ 31. Specifically, Williams was recklessly driving a vehicle and, when stopped by law enforcement, police found a Glock 9mm semi-automatic handgun with a magazine inserted with 10 live rounds and a backpack with marijuana. Williams was sentenced to 48 months' in custody for his 2018 conviction, his second federal § 922(g)(1) conviction, and began his three-year term of supervised release in May 2022. PSR ¶ 31; No. 4:18-CR-547-JSW (N.D. Cal.). Specifically, Judge White sentenced Williams to 41 months on the new charge to run consecutive to 7 months for his Form 12 violation. No. 4:18-CR-547-JSW (N.D. Cal.).

Defendant incurred two Form 12 violations in the year following his release from prison in May 2022. In October 2022, Defendant was pulled over by the Oakland Police Department for reckless driving and was found with 18 individually packaged baggies of methamphetamine in his car. No. 4:18-CR-547-JSW, Dkt. 30 (N.D. Cal.). In May of 2023, Defendant violently attacked his girlfriend and used a car jack to break windows out of her vehicle. Dkt. 47; PSR ¶ 31. The victim also claimed that Williams had attacked her one to two weeks prior to the vandalism of her car, when Williams punched her arm, shoulder, and chest, and grabbed her neck, leaving scratches. PSR ¶ 31. In December 2023, Judge White revoked defendant's supervised release and sentenced him to 24 months' imprisonment, followed by 12 months of supervised release. PSR ¶ 31. The conduct underlying the instant offense occurred during those 12 months. *Id.*

**IV. Procedural Posture**

On March 18, 2026, the Government charged Williams via Information with one count of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). Dkt. 1. On March 27, 2026, Defendant waived indictment and was arraigned on the Information. Dkt. 5. Williams waived his right to a detention hearing pending trial and Magistrate Judge Kang ordered Defendant

remanded into custody. *Id.* On May 13, 2026, pursuant to a plea agreement, Williams pleaded guilty to the charge against him. Dkt. 8-9. The government agreed to recommend a sentence of no more than 42 months in custody. *Id.*

## ARGUMENT

### I. Legal Standard

The United States Sentencing Guidelines serve as "the starting point and initial benchmark" of any sentencing process and are to be kept in mind throughout the process. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007). The overarching goal of sentencing, as set forth by Congress, is for the Court is to "impose a sentence sufficient, but not greater than necessary." *Carty*, 520 F.3d at 991 (citation omitted). In accomplishing that goal, the Court should consider the factors set forth under 18 U.S.C. § 3553(a), which include (among other factors):

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (3) the need for the sentence imposed to afford adequate deterrence to criminal conduct;
>
> (4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

### II. Sentencing Guidelines Calculation

As set forth in the PSR and the plea agreement, the Sentencing Guidelines calculations for Defendants offense level is as follows:

| | **U.S.S.G. Section** | **Level/Points** |
|---|---|---|
| Base offense level | § 2K2.1(a)(6) – prohibited person in possession of firearms or ammunition | 14 |
| Specific offense characteristics | None | 0 |
| Acceptance of responsibility | § 3E1.1(a) | -2 |
| Total offense level | | 12 |

PSR ¶¶ 15–23.

The Probation Officer concluded that Defendant's criminal history score is 11, and he therefore falls into Criminal History Category V. *Id.* ¶ 34. As reflected in the PSR, the Guidelines range for imprisonment associated with adjusted offense level 12 and Criminal History Category V is 27-33 months of incarceration. *Id.* ¶ 72. The Probation Officer recommends a 27-month sentence. *Id.* at Sentencing Recommendation. Because the guideline range falls into Zone D of the Sentencing Table, the minimum term must be satisfied by a sentence of imprisonment. *Id.* ¶ 72; USSG §5C1.1(f). In addition, the Probation Officer overseeing Williams's Form 12 violation recommends a 24-month sentence. Dkt. 90 at pg. 2. If the Court were to impose those sentences and run them consecutive, that would equate to a 51-month term of imprisonment.

**III. The United States' Sentencing Recommendation**

Based upon a consideration of the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a), the government respectfully recommends a custodial sentence of 42 months imprisonment—consisting, consecutively, of 18 months in this case, and 24 months for the supervised released violation—to be followed by a three-year term of supervised release. *See* PSR at Sentencing Recommendation. This sentence accounts for a nine-month downward variance from the advisory guideline range. *Id.* Consistent with 18 U.S.C. § 3553(a), such a sentence is sufficient, but not greater than necessary, to reflect the seriousness of the offense and to provide deterrence, but also to account for relevant mitigating factors.

As discussed above, gun violence has plagued Oakland for far too long. In an effort to tackle this problem, beginning in March 2026, federal and local law enforcement coordinated efforts in a surge of federal firearm enforcement measures in Oakland and the East Bay that resulted in the seizure of 76 illegally possessed firearms and charges against 51 defendants. Williams is one of those defendants. Williams possessed a loaded gun in a public place and, upon seeing the OPD officers, hid it low toward the ground behind some boxes in a publicly accessible area where other customers were milling about. The government's recommended sentence in this case therefore plays a key role in its efforts to disrupt the cycle of gun violence in the East Bay by deterring Williams from yet again possessing dangerous guns once released, and others like Williams who continue to threaten the safety of the East Bay

community by illegally possessing firearms. This, in turn, reflects the need for the sentence to promote respect for the law and afford general deterrence. *See* U.S.S.G. § 3553(a)(1), (a)(2)(A)–(B).

In addition, for characteristics of the defendant, specific deterrence, and to protect the public from further crimes of the defendant, it is notable that this is Williams's *third* federal conviction for § 922(g)(1), in addition to interim additional convictions leading to violations of supervised release and additional federal prison terms. *See* U.S.S.G. § 3553(a)(2)(C)–(D). He was previously sentenced in 2015 and 2019 to 40 and 48 months in custody, respectively, for the same crime. *Id.* at Sentencing Recommendation. Those prior convictions and sentences did not deter him from again possessing a firearm and ammunition. The present offense also occurred while Williams was on federal supervised release. This violation thus represents his fifth violation of supervised release, and has resulted in his third revocation since 2014. *Id.* at 29-31. That Williams has separate prior convictions for first and second-degree burglary and domestic violence further underscores the need for a substantial custodial sentence. *Id.* A significant sentence in this case followed by three years of supervised release will hopefully put an end to Williams's dangerous criminal misconduct once and for all.

On the other hand, some sentencing factors support a more lenient sentence. The history and characteristics of Williams, for example, demonstrate that he has faced considerable hardships throughout his life, which the Court has previously considered when sentencing Williams. PSR at Sentencing Recommendation. He lacked a stable living environment as a child. *Id.* at 47. At the age of six, he witnessed his father murder a gardener. *Id.* at 46. Mr. Williams has taken some steps toward greater stability and rehabilitation: at the time of his arrest for the instant offense, he was working to obtain his GED and helping his fiancée care for her children and nieces. *Id.* at 93.

Also in Williams's favor is that after his arrest, he took early and full responsibility for his criminal misconduct. The government is optimistic that this case will serve as an inflection point for Williams. He is now a few days shy of 41 years old. He cannot continue to engage in behavior that threatens the public and that will result in his continued incarceration. Rather than being a threat to the community, the government is hopeful that its recommended sentence, which includes three years of supervised release after his prison term, will be the impetus for Williams to transform himself into a productive member of the community.

**CONCLUSION**

For the foregoing reasons, the government recommends that the Court sentence Defendant to 42 months in prison followed by a three-year term of supervised release.

DATED: August 12, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

_______*/s/ Kelly I. Volkar*________
KELLY I. VOLKAR
Assistant United States Attorney